UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMONT RUTH,

        Plaintiff,

v.                                    Case No. 09-11278
                                    Honorable Julian Abele Cook, Jr.

BRYAN FORD,

        Defendant.

## ORDER

This case involves several claims by the Plaintiff, Lamont Ruth, who contends that his fundamental rights under the United States Constitution and 42 U.S.C. § 1983 were violated by the Defendant, Bryan Ford, while acting as a law enforcement officer for the Grosse Pointe Farms, Michigan community when he stopped and conducted a warrantless search without reasonable suspicion, probable cause, or any other legal premise.

On January 27, 2010, Ford filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(c).[1] Ruth, in opposing this motion, has created an issue that is now ripe for a review by this Court.

I.

On March 14, 2007, at approximately 12:30 in the afternoon, the Grosse Pointe Farms

---

[1] Fed. R. Civ. P. 56(c) states, "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

1

Department of Public Safety Dispatch received a telephone call from a woman who claimed to be near the intersection of McMillan and Chalfonte in Grosse Pointe Farms. The caller stated that she saw a "suspicious gentleman" riding a bicycle near the intersection of McMillan and Chalfonte Streets, heading toward Mack Avenue. This message was thereafter relayed by the dispatcher to all of the patrol units. In her message, the dispatcher told the patrol units that the caller had "requested the patrol officers to check for a suspicious subject in the area of McMillan and Chalfonte heading towards Mack, and described the subject as a black male on a bike wearing a dew-rag and yellow shirt, carrying a woman's black purse, and pedaling very fast as though he was trying to get away from someone." (Dispatcher Aff., Def.'s Ex. 1 ¶ 10.) Both the dispatcher and Ford acknowledge that the caller had neither identified nor reported any criminal activity.

Ford, acting upon his experience as a police officer in Grosse Pointe Farms, suspected a possible property theft because "it is unusual for a male, carrying a purse, to be riding a bike at high speed in this general area of [Grosse Pointe Farms]; and property thefts are common in this general area of [Grosse Pointe Farms]." (Def.'s brief, p. 1.) However, when Ford's initial search of the area for the "suspicious subject" proved to be unsuccessful, he abandoned the search and devoted the balance of his immediate energy to assisting a fellow officer at the nearby intersection of Mack Avenue and Manor Street. Soon thereafter, Ford observed an individual whom he believed matched the description of the alleged "suspicious subject." This person, who turned out to be Ruth, was riding a bike on Manor Street, crossed Mack Avenue and rode into a drug store (i.e., CVS) parking lot. Ford followed Ruth into the CVS parking lot and exited his police vehicle after directing Ruth to come to him. Upon receiving this directive, Ruth got off of his bike, and approached Ford. When asked for his identification, Ruth removed the bag (a cooler bag) from his shoulder and placed it on

the ground in order to retrieve an identification from the wallet in his right pants pocket.[2] After Ruth tendered his driver's license to Ford which was returned shortly thereafter, he was asked, "where are you going?" In response, Ruth advised Ford that he had traveled to the drug store to pick up his script, and "if he didn't believe me, he could go and get it himself." (Ruth Dep., Plf.'s Ex. A, p. 92.) Ford's recollection of the event varies from Ruth's version. According to Ford, he asked the bicyclist where he had come from and, thereafter, unilaterally determined that the route that had been taken by Ruth to reach the drug store was not the most direct route. He also maintains that Ruth appeared to be extremely nervous and showed, in his opinion, a desire to distance himself and his bag from close scrutiny. These contentions and conclusions were denied by Ruth who sharply disputed Ford's characterization of his conduct.

At the conclusion of this verbal exchange between these two parties, Ford conducted a pat-down search of Ruth. Although Ford alleges that he had asked Ruth if he was carrying any weapons, Ruth denies this allegation. According to Ruth, his cooler bag was picked up from the ground by Ford who proceeded to examine its contents without his consent, which included the unzipping of a pocket of the bag, where he found a .32 caliber handgun. Ford maintains that, prior to finding the weapon, he felt the outside of the bag and detected the outline of a handgun. In his opinion, this finding prompted him to search an outside compartment of the cooler bag, where he uncovered the weapon which formed the basis for arresting Ruth and placing him in handcuffs. Ford also avers that "Ruth admitted that he used the handgun for personal protection and admitted that he did not have

---

[2]According to Ruth, the water bottle was, or should have been, plainly visible to Ford during this encounter because the top of the cooler bag was open.

a permit to carry a concealed weapon." (Def.'s brief, p. 3.)[3]

Following his arrest, Ruth was taken to a Grosse Pointe Farms lock-up facility where he was searched again by officers who found .32 caliber bullets in his pocket.[4] Thereafter, Ruth (1) signed a document in which he acknowledged having been informed of his fundamental rights as an accused under the United States Constitution, and (2) executed a written statement wherein he maintained his use of the gun was only for his personal protection.[5]

After concluding that the preliminary investigative work had been completed, Detective Ricky Good forwarded (1) an investigator's report, (2) Ford's arrest report, and (3) a request for a warrant recommendation to the Wayne County Prosecutor's Office. On March 15, 2007, the Wayne County Prosecutor filed a felony complaint against Ruth for carrying a concealed and dangerous handgun, in violation of Mich. Comp. Laws § 750.227. Ruth was detained in the Wayne County jail for a three day period thereafter until he posted a $500 bond.

In June 2007, an evidentiary hearing was conducted in the Wayne County Circuit Court of Michigan in which Ford was the only witness who had been called upon to testify.[6] In his testimony, Ford testified that he had stopped Ruth who, in his opinion, matched the description of the "suspicious subject" of the dispatch call. The balance of Ford's testimony tended to support the

---

[3]Ruth testified at his deposition that he was unaware that the gun – which belonged to his cousin – was in the cooler bag.

[4]Ruth acknowledges that, although the bullets had been in his pocket for a couple of days, he had forgotten to remove them.

[5]At his deposition, Ruth asserted that the statement was inaccurate, in that he possessed the gun in order to protect his home.

[6]Ruth was represented by counsel during all of the proceedings up to and including his appeal.

4

bases for the events which resulted in Ford's ultimate arrest. Ruth's subsequent effort to suppress the handgun evidence was rejected. Ruth's conviction of the felony was followed by a sentence of probation for a period of eighteen months.

Ruth's appeal from the conviction to the Michigan Court of Appeals yielded a response from the Wayne County Prosecutor's Office, which filed a "Confession of Error." In its "Confession of Error" document, the Wayne County Prosecutor's Office acknowledged that Ford did not have a reasonable suspicion of criminal activity to stop and frisk Ruth. The "Confession of Error" also noted that Ford's (1) search of the bag was not supported by any reasonable suspicion based on articulable facts, and (2) discovery of the gun was therefore not proper. Acting upon the accuracy of this document, the Court of Appeals then vacated Ruth's conviction and sentence.

In March 2009, Ruth initiated this lawsuit, contending that Ford had (1) violated the law pursuant to 42 U.S.C. § 1983, which caused him to be (2) falsely arrested, wrongly imprisoned and subjected to malicious prosecution. Ruth seeks damages because, in his opinion, that he "was incarcerated, lost job opportunities, incurred significant legal expense, court costs and humiliation." (Plf.'s brief, p. 5.) In referring to his encounter with Ford, Ruth submits that he has been under "significant stress" because of this incident which, in turn, has caused him to seek and obtain emergency room treatment for his emotional ills.

II.

Summary judgment is appropriate in cases in which "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, district courts must construe all reasonable inferences

5

in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the evidence demonstrates that there is "sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

In those situations in which the moving party has met its burden of showing that there is no genuine issue as to a material fact, the non-moving party cannot merely rest upon the allegations within the pleadings. *See* Fed. R. Civ. P. 56(e). Thus, the non-moving party must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.

Ford argues that he is entitled to qualified immunity with regard to Ruth's claims under 42 U.S.C. § 1983 because he did not violate Ruth's rights under the Fourth Amendment to the United States Constitution, which provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Ruth opposes this pending motion, arguing that Ford did not have a reasonable suspicion of any

criminal activity when he was stopped and searched, in violation of clearly established law.[7]

The Fourth Amendment protection against unreasonable searches and seizures generally requires the existence of a probable cause. *Safford United School Dist. #1 v. Redding*, 129 S. Ct. 2633, 2639 (2009). Probable cause is present when "the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.*

The protections of the Fourth Amendment also apply to those seizures which result from brief detentions. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Indeed, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* Thus, a police officer is authorized to stop and briefly detain a person, for investigative purposes, if he has a reasonable suspicion, based on articulable facts, that criminal activity may be afoot. *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) (quoting *Terry*, 392 U.S. at 20). Moreover, in order to conduct a search of the detained individual's person, the officer must have a reasonable belief that he is dealing with an armed and dangerous individual. *Terry*, 392 U.S. at 27. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* However, when officers "go beyond checking out the

---

[7]According to 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

7

suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause." *Walters v. Stafford*, 317 Fed. Appx. 479, 485 n.6 (6th Cir. 2009) (citing *Smoak v. Hall*, 460 F.3d 768, 780-81 (6th Cir. 2006)).

"Generally, questions about whether the police had a reasonable suspicion or probable cause are presented to a jury in a § 1983 case, but they may be determined by the court if there is only one reasonable determination possible." *Manley v. Paramount's Kings Island*, 299 Fed. Appx. 524, 526 (6th Cir. 2008).

A.

The Court first turns to Ford's assertion that he is entitled to qualified immunity. In 1982, the Supreme Court held that "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is a question to be resolved by the district court and in which the plaintiff bears the burden of showing that the defendant is not entitled to the immunity. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). To determine if the governmental official is entitled to qualified immunity, courts must ask (1) whether the facts - taken as alleged by the plaintiff and viewed in a light most favorable to him - show that the officer violated a constitutional right and (2) whether this right was clearly established so that a reasonable officer would have known that the conduct was unlawful. *Id.* at 201. The Supreme Court has recently held that these inquiries need not be addressed in that order, although this sequence is "often appropriate." *Pearson v. Callahan*, 555 U.S. ____ (2009).

In the case that is now pending before the Court, Ford proclaims that he had a reasonable

suspicion to stop Ruth, whose description matched the "suspicious subject" who had been described in the dispatch call. However, when an accused law enforcement officer relies upon evidence that was presumptively enhanced by a search which, in turn, was prompted by a radio message, flyer, or bulletin, the admissibility of this evidence turns on whether the entity or person who issued the initial "message of distress" had a reasonable basis upon which to believe that the accused had committed a criminal offense. *United States v. Henley*, 479 U.S. 221, 231-32 (1985). Here, the dispatcher acknowledged in her message that the caller had not seen any "activity or incident." Thus, the dispatch message was not based upon any reasonable suspicion of a criminal activity that was founded on articulable facts - only a hunch that Ruth had committed property theft, which is insufficient basis upon which to justify an investigatory stop. Moreover, after viewing the facts in the light most favorable to Ruth, it was evident that the "purse" which was thought by the caller to be the subject of a theft was, in actuality, a cooler with a water bottle visibly inside. Thus, Ford's investigatory stop of Ruth was contrary to the Fourth Amendment.

Furthermore, Ford cannot avail himself of a good faith reliance on the dispatch call. In *Hensley*, the Court held that an officer who made a stop on the basis of a radio message may be entitled to a good-faith defense to any civil suit. 469 U.S. at 232. "It is the objective reading of the [radio message] that determines whether other police officers can defensibly act in reliance on it." *Id.* (citing *Terry*, 392 U.S. at 21-22). Contrary to the arguments by Ford, this case does not present a circumstance in which a reasonable police officer could defensibly rely upon the dispatch call to conduct an investigatory stop.

As discussed above, it was abundantly clear from the message itself that the anonymous caller had not seen any incident or activity, but relied upon a hunch that Ruth had engaged in some

9

form of illegal activity - precisely that which *Terry* is meant to prevent. *See Terry*, 392 U.S. at 22 ("Anything less [than an objective standard of reasonableness] would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction." ) When Ford initially encountered Ruth, he was able to see or should have been able to see that the bag was not a woman's purse which further confirmed that the anonymous caller's suspicion was nothing more than a hunch. Thus, there is no factual basis for Ford to conclude that he was acting in accordance with *Terry*. The Court therefore concludes that Ruth has shown that Ford committed a constitutional violation in conducting the investigatory stop. Moreover, Ruth's constitutional right to be free from unreasonable seizures was clearly established at the time Ford detained Ruth. *Terry* stands for the proposition that even investigatory stops must be prompted by a reasonable suspicion of criminal activity. *Terry*, 392 U.S. at 27.

Ford's subsequent pat-down of Ruth is also violative of the Fourth Amendment. Ford submits that Ruth appeared to be nervous and was attempting to distance himself and his bag from any investigatory examination. Although the Supreme Court has held that a person's outward ostensibly evasive behavior may be relevant to a reasonable suspicion inquiry, it is only one factor to be considered by the court. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In order to conduct a constitutionally sound pat-down search of a person, the examining officer must have reasonable suspicion that the person is armed and dangerous. *Terry*, 392 U.S. at 27. Even assuming that Ruth was nervous, this factor standing alone would not lead a reasonable officer in Ford's situation to conclude that Ruth had a weapon. Ruth's right not be patted down absent reasonable suspicion that he was armed and dangerous was also clearly established at the time of the incident

in question. *See id.*

Even though Ford's pat down of Ruth's person did not result in uncovering any weapons, he continued his search by examining the content of Ruth's cooler bag. Generally, seizures of property require probable cause. *Bennett v. City of Eastpointe*, 410 F.3d 810, 825 (6th Cir. 2005). However, a brief detention of personal property may be allowed if it is based on a reasonable suspicion of criminal activity. *Id.* Ford acknowledges that he did not receive Ruth's consent to search his bag. Notwithstanding, he maintains that his search was "directly connected to suspected evidence of theft of personal property." (Def.'s brief, p. 15.) However, the "suspected theft," about which Ford speaks, was based upon the anonymous caller's belief that Ruth had stolen a woman's purse. As explained above, and based on the facts viewed in a light most favorable to Ruth, Ford's belief in a suspected theft does not constitute reasonable suspicion of criminal activity where the bag was actually a cooler and not a woman's purse, as the dispatcher had mentioned. As such, viewing the facts in Ruth's favor, he has shown that Ford's conduct was unconstitutional. Moreover, Ruth's right to be free from unreasonable searches and seizures of his property was clearly established in *Bennett* and other Supreme Court and Sixth Circuit precedent. *See, e.g., United States v. Place*, 462 U.S. 696, 701 (1983); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543-44 (6th Cir. 2002).

Therefore, the Court determines that Ford is not entitled to qualified immunity with respect to Ruth's § 1983 claims.[8]

---

[8] Ruth has not asserted that Ford violated his rights under the Fourth Amendment by arresting him and placing him in jail for three days.

B.

Alternatively, Ford contends that Ruth has failed to perfect a Section 1983 claim because he cannot show that his claimed damages (e.g., lost wages, legal expenses) were proximately caused by the alleged constitutional violation. Ford also alleges that even if his conduct in the search and seizure was unconstitutional, Ruth has not presented any evidence that he has suffered damages as a result of the violation. Ruth, on the other hand, argues that because Ford's stop and search of his person and his bag were unlawful, the subsequent arrest for carrying a concealed weapon, prosecution, and conviction were also contrary to law.

In 2001, the Third Circuit Court of Appeals declared:

> When we reflect on the interests protected by the Fourth Amendment, we believe that it follows that a plaintiff cannot recover the litigation expenses incurred because police officers discovered criminal conduct during an unconstitutional search. As the Second Circuit has said in a case much like ours, "The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999). If *Carey* [*v. Piphus*, 435 U.S. 247 (1978)] instructs that we should assess liability in terms of the risks that are constitutionally relevant, then damages for an unlawful search should not extend to post-indictment legal process, for the damages incurred in that process are too unrelated to the Fourth Amendment's privacy concerns. We agree with *Townes*: "Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy--including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." 176 F.3d at 148.

*Hector v. Watt*, 235 F.3d 154, 157 (3rd Cir. 2001). Similarly, the Second Circuit Court of Appeals in *Townes,* held that the purpose of granting an aggrieved person the right to assert § 1983 damages is to provide an avenue to compensate for the injuries caused by the deprivation of constitutional rights. *Townes v. City of New York*, 176 F.3d 138, 147 (2nd Cir. 1999).

The Court finds the opinions of the Second and Third Circuits to be persuasive. Here, Ruth

12

is seeking damages because of his incarceration, legal fees, loss of employment opportunities , and emotional distress. These damages, however, appear to be connected to his time in jail, as well as the felony conviction, and probationary sentence - but not to the alleged invasion of his privacy under the Fourth Amendment. As such, they are not related to the constitutional injury which he claims to have suffered at the hands of Ford.

Moreover, the Court in *Townes* recognized that those plaintiffs who allege the elements of a common law malicious prosecution claim under § 1983 may recover "damages for confinement imposed pursuant to legal process." *Id.* at 149. However, assuming that Ruth has brought a malicious prosecution claim under § 1983[9] against Ford, the Sixth Circuit Court of Appeals has held that "[an officer] cannot be held liable for malicious prosecution when he did not make the decision to prosecute [the plaintiff]." *Skousen v. Brighton High School*, 305 F.3d 520, 529 (6th Cir. 2002). Ruth has not proffered any evidence to show that Ford had anything to do with the decision by the Wayne County Prosecutor's Office to bring charges against him. On the basis of the current record, the person who faxed all of the relevant information to the prosecutor was Detective Ricky Good. In addition, a second intervening cause of Ruth's prosecution is the decision by the Wayne County Circuit Court to deny his motion to suppress. *See Powers v. Hamilton Co. Public Def. Comm.*, 501 F.3d 592, 611 (6th Cir. 2007) (defendant shielded from liability where trial judge made a legally erroneous decision).

Thus, because Ruth's claimed damages are too remote from the constitutional injuries that were inflicted upon him by Ford, the Court holds that he is not entitled to recover any damages

---

[9] Based on the conclusory allegations in Ruth's complaint and the arguments in his response in opposition to Ford's motion, it appears that his malicious prosecution claim was brought under state law.

13

arising out of his incarceration (e.g., legal expenses, court costs) and the loss of employment opportunities due to his conviction.

Furthermore, Ruth has failed to show that he has suffered an actual injury as a result of Ford's alleged violation of his Fourth Amendment rights. The Supreme Court opined in 1978 that a § 1983 plaintiff is not entitled to receive compensatory damages unless he proffers proof of an actual injury. *Carey*, 435 U.S. at 264. Nearly a decade later, the Supreme Court held that § 1983 litigants cannot recover compensatory damages based on the inherent "value" of a constitutional right. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986). Although *Carey* held that mental and emotional damages are compensable under § 1983, these damages are recoverable only if the plaintiff has shown "competent evidence concerning the injury." *Carey*, 435 U.S. at 264 n. 20 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

In this case, Ruth is not entitled to be compensated by Ford for the alleged damages that he sustained as a result of his arrest, prosecution, and conviction for the crime of carrying a concealed weapon. Thus, assuming that a jury finds that Ford violated Ruth's constitutional rights in stopping him and searching his person and cooler bag, he is only entitled to damages stemming therefrom. Here, Ruth has neglected and/or failed to present evidence that he sustained any injury as a result of Ford's alleged unconstitutional conduct. Although Ruth made vague allegations during his deposition of the stress that he incurred as the result of Ford's misconduct, he has failed to establish that it was a result of the alleged Fourth Amendment violation. Moreover, he has not proved these damages with the reasonable specificity that is required to survive Ford's dispositive motion. *See, e.g.*, *Rodgers v. Fisher Body Div., General Motors Corp.*, 739 F.2d 1102, 1108 (6th Cir. 1984) ("While jurors might easily infer that going on welfare and losing one's car would cause emotional

distress, plaintiff has not demonstrated his mental distress with the specificity required by *Carey v. Piphus*.") Ruth has only proffered a mere scintilla of evidence to show that he suffered actual injury as a result of Ford's unconstitutional invasion of his privacy.

Notwithstanding Ruth's inability to prove actual injury, the Supreme Court held in *Stachura* that nominal damages may be recovered without proof of an actual injury. *See Stachura*, 477 U.S. at 308 n.11. Thus, if a jury finds that Ford violated Ruth's constitutional right to be free from unreasonable searches and seizures, he is entitled to an award of nominal damages.

Ruth also asserts in his complaint that he is entitled to receive punitive damages as a result of Ford's misconduct. Punitive damages are available under § 1983 if a jury finds that the defendant's conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Although Ruth has not advanced any arguments or evidence upon which to support his claim that Ford had acted with any evil motive or intent, a jury could arguably determine that the claimed misconduct was committed with a callous indifference toward his constitutional rights when seizing and searching him without reasonable suspicion of criminal activity.

Therefore, the Court determines that Ruth may only present his § 1983 claim of unreasonable search and seizure to recover nominal and punitive damages, if any.

IV.

With respect to Ruth's tort claims, Ford believes that he is entitled to governmental immunity because he made discretionary decisions in good faith and during the scope of his employment as a police officer. In opposing Ford's defense, Ruth states that these claims are "specifically recognized in Michigan Law as an exception to governmental immunity."

The Governmental Tort Liability Act states, in pertinent part:

> Sec. 7. (1) Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.
> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.
> (3) Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986.

Mich. Comp. Laws § 691.1407(2), (3).

In 2008, the Michigan Supreme Court issued an opinion which addressed the "substantial confusion [that had] arisen regarding the proper interpretation of the *Ross* [*v. Consumers Power Co. (On rehearing)*, 410 Mich. 567 (1984) ] test for individual governmental immunity as it is applied to intentional torts." *Odom v. Wayne County*, 482 Mich. 459, 473 (2008). The Court then indicated that in order to be immune from liability for intentional torts, the petitioner- governmental employee must establish that (1) the acts were taken during the course of employment, (2) he was acting, or reasonably believed he was acting, within the scope of his authority, (3) he was acting in good faith, and (4) the challenged act must be a discretionary one. *Id.* The Court also held that to establish that he acted in good faith, "the proponent of individual immunity must establish that he acted without

16

malice." *Id.* at 475. With respect to whether an act is ministerial or discretionary, the Court explained that "[a]n officer must use his judgment to determine whether there is reasonable suspicion to investigate or probable cause to arrest and to determine the amount of force necessary to effectuate an arrest," and thus these actions are discretionary. *Id.* at 476. In addition, the *Odom* Court determined that governmental employees bear the burden of showing that they are entitled to governmental immunity as an affirmative defense. *Id.* at 479.

The Court first notes with significant interest that Ruth has failed to address or even cite the *Odom* opinion of the Michigan Supreme Court. Rather, he points to a decision by the Michigan Court of Appeals case issued in 1997. Inasmuch as *Odom* represents the most recent rule from the highest court of the State of Michigan, the Court will apply its holdings to the case at bar.

Applying the above-referenced *Odom* standards to the case *sub judice*, the Court holds that Ford is entitled to governmental immunity. It is undisputed that (1) the acts in question occurred during the scope of Ford's employment as a police officer and (2) he was acting, or reasonably believed to be acting, under the scope of his authority. Also, Ford asserts - without any refutation - that he did not act with malice at any time during his encounter with Ruth. Thus, Ford is entitled to governmental immunity as to all three of Ruth's intentional tort claims (i.e., false arrest, false imprisonment, malicious prosecution).

V.

Accordingly and for the reasons that have been stated above, the Court grants in part, and denies in part, Ford's motion for summary judgment.

IT IS SO ORDERED.

Dated:  August 17, 2010                          s/Julian Abele Cook, Jr.
         Detroit, Michigan                        JULIAN ABELE COOK, JR.
                                                  United States District Court Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 17, 2010.

                                                  s/ Kay Doaks
                                                  Case Manager